### THE A. CROSSMAN.[1]

### DONNELLY v. THE A. CROSSMAN et al.

#### (District Court, S. D. New York. October 31, 1893.)

COLLISION—STEAM VESSELS MEETING—LOOKOUT—DELAY IN SIGNALING—FAILURE TO REVERSE.

The steamship M., coming down the East river above the bridge, found herself embarrassed by various tows ahead and on the New York shore, and therefore kept towards the Brooklyn shore, giving two whistles to the leading tows, and passing them on her starboard hand. The tug C., going up the river astern of the above-mentioned tows, and having libelant's scow in tow on a hawser, also received two whistles from the M., when the latter was very near. Having previously given insufficient attention to the M., the C. gave one whistle, and headed more to the Brooklyn shore, but the steamship struck libelant's scow. Libelant brought suit against the C. and against the pilot of the M., the latter steamship not being found within the jurisdiction. Held, that the inattention of the C. to the position and course of the M., the delay in signaling on the part of both vessels, the attempt of the C. to cross the bows of the M. towards Brooklyn, and the failure of the M. to reverse when the C. was seen, all contributed to the collision, and hence, that both defendants were in fault.

In Admiralty. Libel for collision. Decree for libelant.

[1]Reported by E. G. Benedict, Esq., of the New York bar.

Stewart & Macklin, for libelant.
Carpenter & Mosher, for the Crossman.
McCarthy & Berrier, for Wood.

BROWN, District Judge. On the 22d of March, 1892, about 2 P. M., the Spanish steamship Murciano, bound down the East river, when a little below Catharine street ferry, on the Brooklyn side, and probably about three or four hundred feet off the Brooklyn shore, came in collision with the libelant's scow Arthur D., which was in tow on a hawser from the steam tug A. Crossman, and about 200 feet astern of her, bound up the river, by which the libelant's boat was considerably injured. The above libel was filed to recover the damages against the tug Crossman, and against the respondent Nathan Wood, who was the pilot in charge of the Murciano, the steamer herself not being found within the jurisdiction.

The testimony in the case is conflicting, and there is much confusion as to many of the facts. The principal facts, as I find them, are as follows:

When off Jay street, Brooklyn, the pilot of the Murciano found the middle of the river on the New York side embarrassed by at least four different tows, all only a short distance below the bridge; while ahead of him, and towards the Brooklyn side, was a James street ferryboat, about to round for her New York slip just above the bridge. It was not prudent for the Murciano to keep on and go among these several tows in the middle, or on the New York side of the river, and she properly, therefore, kept towards the Brooklyn side. Above Jay street the Murciano had been going at only half speed; at Jay street she was reduced to dead slow; and off Adams street her engines were stopped, with the intent to wait above the bridge, and on the Brooklyn side, until all the tows below had passed up under the bridge, so as to avoid being carried against any of them by any sheer to starboard that the steamer would be liable to when the flood current struck his port bow if she went on. Accordingly, when off Adams street, being then about one-third the distance across from the Brooklyn shore, she gave a signal of two whistles to the leading tow, which was answered by two; and soon after she gave another signal of two whistles to the other tows, as they approached the bridge. According to the testimony for the Murciano, a third signal of two whistles was given to the Crossman, which was answered by her with one whistle. The witnesses for the Crossman testify that the signal given to her was before the signals given to the other tows; and that the steamer's signal was a signal of one whistle only. I am persuaded, however, that this is a mistake, and that the Murciano gave no signal of one whistle at or about that time. The situation and the circumstances render it wholly improbable, and the direct evidence on her part to the contrary should be accepted as correct.

The opposing testimony of the captain of the Rambler about the Crossman's whistles has little weight with me, because it is in part certainly incorrect; he was considerably below the Crossman, and there is probable confusion with other signals. In the beginning of his testimony on that subject he says: "When I first noticed the

steamship was the tugboat Archie Crossman's first whistle;" "when I heard the Crossman blow one whistle, I see the steamship," which indicates that he had not before noticed the steamer. By subsequent leading questions he was made to say that he heard the steamer give one whistle in answer to the Crossman. This also agrees in making his first notice of the steamer to have been after one whistle from the Crossman. But it is certain that the steamer gave no whistle at all in answer to the Crossman. Whatever the steamer's whistles were, they were before the Crossman's; and from his first answer, it is evident to my mind that he had not noticed the steamer until after the Crossman's one whistle, to which he refers, was given. This, moreover, was, as he says, "several minutes" before his own signal to the Murciano; he repeats this statement, in effect, several times; and this makes it probable that the Crossman's exchange of whistles which he was thinking of, was not the exchange with the steamer, but the exchange with the James slip ferryboat about a minute before. For the master of the Crossman testifies that· he exchanged a signal of one whistle with that ferryboat, when the latter was a little above the bridge and heading towards the Cross man, at the time when the Crossman was off Jewell's wharf; that is, only a few hundred feet below the bridge. From the speed of the Crossman in the flood tide, it is certain that the exchange of whistles could not have been more than about one minute, probably less than a minute, before her signal of one whistle in reply was given to the Murciano, when the Crossman was under or just above the bridge. It is probable, therefore, that the exchange of one whistle, referred to by the captain of the Rambler, was the exchange with the ferryboat, though he states them in the wrong order. This explanation would also agree with pilot Wood's testimony that his signal to the Crossman was after his signals to the other three tows.

That the Murciano's headway by land was nearly, if not wholly, checked at the time of the collision, is sustained not only by the direct evidence on her behalf, but by the fact that the libelant's scow, though light, did not receive any more damage than her own speed— probably not less than eight miles an hour with the tide—would account for; and by the further fact that most of the various tows had passed or were abreast of the Murciano when the collision occurred, and the fact that under her previous headway, without backing, she had reached, at collision, a few hundred feet only below the Catharine ferry.

I am obliged also to find that the Murciano was not further from the Brooklyn shore than the Crossman was, at the time when the signals between them were exchanged; that the Crossman was then heading somewhat towards the Brooklyn shore, and that that circumstance alone brought the Murciano on her port bow; that there was no material sheer of the Murciano towards the Brooklyn shore after the signals between them; that there was not time after those signals for the Murciano to change her place in the river materially, considering her very slow motion by land, and the fact that at collision the Murciano was pointing nearly straight down the river. There is also no doubt that the scow at collision was crossing the

river at an angle of at least a point and a half towards the Brooklyn shore, following the direction of the tug, and that the latter was at least 150 feet off from the side of the steamer at collision. This furnishes conclusive proof that before the Crossman's porting in the attempt to cross the steamer's bow, she and her tow must have been further away from the Brooklyn shore than the Murciano, and that there would have been no collision had the Crossman kept her previous and proper course up the river to the westward of the steamer.

I find, therefore, that the collision was brought about, first, by the insufficient previous attention by the Crossman to the position and course of the Murciano; secondly, through too great delay in the giving of signals to each other by both; thirdly, through the attempt by the Crossman to cross the bow of the Murciano towards the Brooklyn shore without necessity; and fourthly, through the failure of the Murciano to reverse her engines when the course of the tug was seen. The evidence does not show any justification for the omission of the latter duty. On backing, the bows of the Murciano would have gone to starboard, and this change of her heading, with a little backward motion, might very likely have avoided the collision; at least, I cannot find that it might not have avoided the collision, and hence cannot say that the nonobservance of the rule was immaterial.

Both defendants must, therefore, be held in fault. Decree for the libelant against both, in the usual form, with costs, and a reference to compute the damages, if not agreed upon.